UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL SYSTEMS GROUP, INC., | ECF Case 21-CV-6301 |
| *Plaintiff*, | CIVIL ACTION NO. |
| - against - | **COMPLAINT** |
| SETH CARMICHAEL, CARMICHAEL GALLERY, LLC, and JOHN DOE, | |
| *Defendants*. | |

Plaintiff International Systems Group, Inc. ("ISG"), by its attorneys Olsoff | Cahill | Cossu LLP, as and for its Complaint against defendants Seth Carmichael ("Carmichael"), Carmichael Gallery, LLC (the "Gallery"), John Doe ("Doe") and together with Carmichael and the Gallery, "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1. This action stems from ISG's sale via Carmichael and the Gallery of two valuable artworks, a painting and a sculpture (the "Works") in reliance on representations Carmichael made which were blatantly false and which Carmichael made to induce ISG to sell Carmichael and the Gallery the Works. Worse still, on information and belief, Carmichael *forged* the signature of a purported "buyer" on one of the sale agreements with ISG, apparently in order to mislead ISG into believing that the purported "buyer" was aware of and affirmatively agreed to the terms of the agreement. Carmichael and the Gallery's actions render them liable not only for breach of contract, but also for fraud, both personally and in a corporate capacity.

2. To induce ISG to sell the Works at advantageous prices, Carmichael represented that neither of the Works would be resold within three years of the date of sale, that ISG would

have the exclusive right of first refusal to repurchase the Works, and that Defendants' "clients" to whom he was selling the Works, would also be bound by these restrictions.

3. Carmichael's representations were false. After explicitly agreeing not to do so, Carmichael and the Gallery quickly sold the Works to buyers who may not have been unaware of the resale restrictions and rights of first refusal that were conditions of ISG's sales of the Works.

4. Despite Carmichael's representations, shortly after ISG sold the Works, ISG discovered from several different sources—sources who had no knowledge of the resale restrictions or ISG's rights of first refusal—that the Works were being offered for sale or had been resold via intermediaries in clear violation of the agreed upon conditions of sale.

5. The conditions of ISG's agreement to sell Carmichael and the Gallery the Works were material to ISG and non-negotiable because the Works were created by an important living artist (the "Artist"). Given the Artist's stature and the need to protect both the value of his artworks and his long-term artistic legacy, ISG would not have agreed to sell the Works to Carmichael and the Gallery absent assurances from Carmichael that he was not a speculator whose goal was in actuality to simply turn around and "flip" the Work to another, unknown buyer who would potentially pay much more on the "secondary," *i.e.*, resale, market, whether at private sale or auction. It is well-recognized in the art market that such resale "flips" cause instability in the market and pose a risk of devaluing an artist's work (both commercially and critically) over the long term.

6. Because of Carmichael's blatant misrepresentations and Carmichael's and the Gallery's egregious breaches of the parties' agreements, ISG has been significantly harmed— ISG has lost its valuable rights of first refusal, as well as access to the Artist's exclusive primary

market. Despite due demand to Carmichael and the Gallery to resolve this matter, they have refused to do so. Left with no other recourse, this action followed.

## PARTIES AND JURISDICTION

7. International Systems Group, Inc. is a duly organized New York corporation with a principal place of business in New York County.

8. On information and belief, Defendant Seth Carmichael is an individual residing in Evergreen, Colorado.

9. On information and belief, Defendant Carmichael Gallery, LLC is a limited liability company organized under the laws of the state of Florida with an address at 3208 W. Price Avenue, Tampa, Florida, 33611.

10. On information and belief, Defendant John Doe is an individual residing in Florida and the current possessor of the 2010 Work (defined below).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 due to diversity of the parties and because the amount in controversy exceeds $75,000.00.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in the Southern District of New York.

## FACTS

**Background**

13. ISG, via its principal, collects and holds works of fine art.

14. Among ISG's acquisitions was a painting created by the Artist in 2015 (the "2015 Work") and a sculpture created by the Artist in 2010 (the "2010 Work").

15. On information and belief, Carmichael at one point operated an art gallery in Los Angeles, California called Carmichael Gallery, LLC.

16. On information and belief, sometime after 2012, the California Secretary of State suspended Carmichael Gallery, LLC.

17. On information and belief, on or about 2016-August-16, Carmichael formed Defendant Carmichael Gallery, LLC, a limited liability company in Florida.

18. On information and belief, the Gallery was administratively dissolved by the Florida Secretary of State on or about 2017-September-22 and was reinstated on or about 2017-December-15.

19. On information and belief, the Gallery was again administratively dissolved by the Florida Secretary of State on or about 2018-September-28 and was again reinstated on or about 2019-October-18.

20. On information and belief, the Gallery was again administratively dissolved by the Florida Secretary of State on or about 2020-September-25 and was again reinstated on or about 2021-January-18.

21. On information and belief, at all relevant times, Carmichael, as the sole member of Carmichael Gallery, LLC and only individual authorized to manage the Carmichael Gallery, LLC, through his domination of the Gallery abused the privilege of doing business in the corporate form.

22. On information and belief, Carmichael failed to adhere to corporate formalities by inadequately capitalizing the Gallery.

23. On information and belief, Carmichael failed to adhere to corporate formalities by commingling Carmichael's and the Gallery's assets.

24. On information and belief, Carmichael failed to adhere to corporate formalities by failing to maintain active status of the Gallery in accordance with the laws of the State of Florida.

**The Sale of the 2015 Work to Carmichael in June 2018**

25. In or about June 2018, Carmichael entered into discussions with ISG concerning the Gallery's purchase of the 2015 Work, purportedly on behalf of an undisclosed buyer allegedly based in Asia (Carmichael's "First Unnamed Asian Client").

26. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with the power to enter into the contemplated transaction.

27. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with assets or the availability of assets to pay debts as they came due.

28. Throughout these discussions ISG made it clear that, as a condition of sale, the 2015 Work could not be sold by Carmichael's First Unnamed Asian Client for a period of three years from the date of purchase (the "Three-Year Resale Restriction").

29. Throughout these discussions ISG also made it clear that ISG required a right of first refusal to repurchase the 2015 Work from Carmichael's First Unnamed Asian Client in the event that the Unnamed Client wished to sell it (the "Right of First Refusal").

30. Throughout these discussions ISG also made it clear that ISG required that Carmichael's First Unnamed Asian Client agree that the 2015 Work would be available for inclusion in a museum exhibition should the circumstances arise (the "Exhibition Right" and, together with the Three-Year Resale Restriction and the Right of First Refusal, the "2015 Work Sale Conditions").

31. To convince ISG to sell him the 2015 Work, Carmichael made explicit representations assuring ISG that the 2015 Work Sale Conditions would jointly bind both the Gallery and Carmichael's First Unnamed Asian Client.

32. Relying on Carmichael's representations, in June 2018 ISG agreed to sell the 2015 Work to Carmichael's First Unnamed Asian Client via the Gallery for a sale price of $415,000.00.

33. As part of this agreement, on 2018-June-27, ISG sent Carmichael an email attaching a revised invoice for the 2015 Work and in which ISG again emphasized the importance of the Three Year Resale Restriction, writing, "I need to make sure the work will not be re-sold at least within the next 3 years."

34. Similarly, on 2018-July-25, ISG sent Carmichael an email, writing, "Further to our SMS exchange, I am confirming that your collector will make [the 2015 Work] . . . available to museum exhibition at my request. It has been agreed that the sale of [the 2015 Work] will be kept confidential and your collector agree not to sell it for the 3 years from the date that title passing . . . Please acknowledge this email as confirmation to our agreement."

35. Carmichael responded that same day, writing, "Confirmed, thanks!"

36. ISG, or indeed nearly any art dealer or agent worth its salt, could have found a buyer for the 2015 Work, whether at auction or via private sale, who would have been willing to pay a significant premium for the 2015 Work if it was not subject to resale restrictions.

37. Even at this time, the sale price was an advantageous sale price for a work by the Artist, which ISG agreed to only in exchange for adherence to the 2015 Work Sale Conditions.

38. Carmichael's acceptance, on behalf of himself, his corporate entity, and his First Unnamed Asian Client, of the 2015 Work Sale Conditions was crucial to securing ISG's

agreement to sell the 2015 Work, as the 2015 Work Sale Conditions were the primary mechanisms by which ISG could retain its privileged position as a purchaser of works by the Artist on the primary market and ensure that it would not get a reputation for "flipping" works by the Artist.

39. If Carmichael, on behalf of himself, the Gallery, and his First Unnamed Asian Client, had not explicitly agreed to comply with the 2015 Work Sale Conditions, ISG would not have agreed to sell the 2015 Work.

40. Carmichael's representations concerning his, the Gallery's, and the First Unnamed Asian Client's adherence to the 2015 Work Sale Conditions was a basis of the parties' bargain.

41. ISG relied on Carmichael's representations and deemed them material to its efforts to ensure its continued participation in the Artist's exclusive primary market.

**The Sale of the 2010 Work in November 2018**

42. On or about 2018-November-20, the parties entered into another agreement, this time for the sale of the 2010 Work (the "November 2018 Sale Agreement").

43. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with the power to enter into the contemplated transaction.

44. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with assets or the availability of assets to pay debts as they came due.

45. At the time that the parties entered into the November 2018 Sale Agreement, ISG informed Carmichael that ISG was only willing to sell to a buyer who was new to the market and preferably based outside of the United States.

46. Carmichael represented that the 2010 Work would be sold to another Asian buyer (Carmichael's "Second Unnamed Asian Client").

47. As with the sale of the 2015 Work, ISG again made clear to Carmichael that as a condition of sale, ISG required that Carmichael, the Gallery, and the Second Unnamed Asian Client agree to the Three-Year Resale Restriction in order to purchase the 2010 Work.

48. ISG also again made clear to Carmichael that ISG required a Right of First Refusal to repurchase the 2010 Work from Carmichael's Second Unnamed Asian Client in the event that the Second Unnamed Asian Client wished to sell it. (The Three-Year Resale Restriction for the 2010 Work and the Right of First Refusal for the 2010 Work together are the "2010 Work Sale Conditions.")

49. As part of the negotiation of the 2010 Work Sale Conditions, Carmichael, purportedly on behalf of his Second Unnamed Asian Client, rejected terms concerning the lending of the 2010 Work to museums during the Three-Year Resale Restriction period.

50. Carmichael represented to ISG that the reason for rejecting the "museum lending" term was that his Second Unnamed Asian Client felt it was too "complicated."

51. To convince ISG to sell him the 2010 Work, Carmichael again made explicit representations assuring ISG that the 2010 Work Sale Conditions would bind Carmichael, the Gallery, and Carmichael's Second Unnamed Asian Client.

52. Relying on Carmichael's representations, ISG executed the November 2018 Sale Agreement to sell the 2010 Work to Carmichael's Second Unnamed Asian Client for a sale price of $1,100,000.00.

53. ISG, or indeed nearly any art dealer or agent worth its salt, could have found a buyer for the 2010 Work, whether at auction or via private sale, who would have been willing to pay a significant premium for the 2010 Work if it was not subject to resale restrictions.

54. Even at this time, the sale price was an advantageous sale price for a work by the Artist, which ISG only agreed to in exchange for adherence to the 2010 Work Sale Conditions.

55. The November 2018 Sale Agreement states: "The Buyer agrees not to sell the [2010 Work] for the 3 years from the date that title of the [2010 Work] passes to the Buyer. Subsequently, if offered for sale the Seller will have the right of first refusal to purchase the [2010 Work] back."

56. ISG insisted on the drafting and execution of the November 2018 Sale Agreement in order to ensure that the crucial 2010 Work Sale Conditions would directly bind Carmichael's Second Unnamed Asian Client as well as Carmichael and the Gallery.

57. Carmichael's Second Unnamed Asian Client purportedly signed the November 2018 Sale Agreement on its own behalf.

58. Carmichael also signed the November 2018 Sale Agreement.

59. On 2018-November-20, Carmichael sent ISG a partially executed copy of the November 2018 Sale Agreement, with the Second Unnamed Asian Client's name and signature partially redacted.

60. Carmichael explained to ISG at that time that such redaction was necessary to preserve the confidentiality of the Second Unnamed Asian Client (as client confidentiality is a

common condition of art transactions to avoid circumvention), but that the name of the Second Unnamed Asian Client could be disclosed in the future if necessary.

61. ISG then executed the November 2018 Sale Agreement and emailed it to Carmichael.

62. Carmichael then arranged for the second installment of the purchase price to be wired to ISG, however, the payment was delayed because, on information and belief, the Gallery's bank account had been frozen due to a money laundering investigation, which Carmichael did not disclose to ISG.

63. Carmichael's acceptance, on behalf of himself, the Gallery, and his Second Unnamed Asian Client, of the 2010 Work Sale Conditions and the embodiment of those Conditions into the November 2018 Sale Agreement was crucial to securing ISG's agreement to sell the 2010 Work, as the 2010 Work Sale Conditions were the primary mechanisms by which ISG could retain its privileged position as a purchaser of works by the Artist on the primary market and ensure that it would not get a reputation of "flipping" works by the Artist.

64. If Carmichael, on behalf of himself, the Gallery, and his Second Unnamed Asian Client, had not explicitly agreed to comply with the 2010 Work Sale Conditions, ISG would not have entered into the November 2018 Sale Agreement.

65. Carmichael's representations concerning his, the Gallery's, and the Second Unnamed Asian Client's adherence to the 2010 Work Sale Conditions was a basis of the parties' bargain.

66. ISG relied on Carmichael's representations and deemed them material to its efforts to ensure its continued participation in the Artist's exclusive primary market.

**ISG Discovers the Works Were Resold in Violation of the Sale Conditions**

67. Despite ISG's Right of First Refusal, in late 2018 ISG was approached by several different sources offering to sell ISG the 2015 Work for $1,300,000.00.

68. Such "shopping" and "flipping" of a work of art by multiple dealers in the secondary market exposes a work, thereby hurting a collector's ability to compete in the primary market, and often results in the work being "burned," *i.e.*, the value of the work decreases because of market perception that no one is interested in purchasing it.

69. ISG learned from these sources that they had no knowledge of ISG's earlier sale of the 2015 Work through Carmichael nor of the crucial 2015 Work Sale Conditions that ISG had bargained for.

70. On 2019-February-08, Carmichael confirmed that the 2015 Work was being offered for sale for a price of $1,300,000.00 in an email to ISG, writing that the 2015 Work "is available for 1.3 m USD" in the event that ISG was interested in purchasing it.

71. Also, in late 2018, ISG learned that the 2010 Work was not actually sold to an Asian buyer, as was represented to it by Carmichael, but instead to Doe, an "end purchaser" based, on information and belief, in Florida.

72. On information and belief, Doe had not acquired the 2010 Work from directly Carmichael, but instead through a group of intermediary art dealers, all based in the United States.

73. On information and belief, Doe had no knowledge of ISG's earlier sale of the 2010 Work through Carmichael nor of the crucial 2010 Work Sale Conditions that ISG had bargained for.

74.     On information and belief, Doe acquired the 2010 Work for a purchase price of $1,350,000.00.

**ISG Approaches Carmichael in an Attempt to Reacquire the Works**

75.     On or about 2019-February-08, ISG emailed Carmichael concerning Carmichael and the Gallery's breaches of the 2015 Work and 2010 Work Sale Restrictions.

76.     Carmichael responded to ISG that same day admitting that Carmichael did not maintain control over the 2015 and 2010 Works, despite having agreed to be bound by the Sale Restrictions.

77.     Around this time ISG and Carmichael had a call during which Carmichael admitted that he "regretted" lying to ISG in connection with the November 2018 Sale Agreement, alluded to the fact that he signed the November 2018 Sale Agreement, and that it was not actually signed by the Second Unnamed Asian Client such that Carmichael "had no choice" given the circumstances.

78.     On information and belief, the signature of Second Unnamed Asian Client on the November 2018 Sale Agreement was a forgery and not that of an Asian-based client—or any client—of Carmichael's.

## FIRST CLAIM FOR RELIEF
### (Breach of the Sale Agreement for the 2015 Work)

79.     ISG repeats and realleges the Allegations set forth in paragraphs 1 through 78 above as though fully set forth herein.

80.     In 2018, ISG and Carmichael agreed that ISG would sell to the Gallery, and the Gallery would buy, on behalf of Carmichael's First Unnamed Asian Client, the 2015 Work.

81. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with the power to enter into the contemplated transaction.

82. At the time ISG was contracting with Carmichael and the Gallery, ISG was made to believe that the Gallery was a viable entity with assets or the availability of assets to pay debts as they came due.

83. ISG and Carmichael and the Gallery agreed to all terms of the sale for the 2015 Work.

84. Pursuant to the terms of the parties' agreement, Carmichael and the Gallery, on behalf of Carmichael's First Unnamed Asian Client, agreed to the Three-Year Resale Restriction and represented that none of them would resell the 2015 Work for a period of three years (*i.e.*, until no earlier than 2021).

85. Pursuant to the terms of the parties' agreement, Carmichael and the Gallery, on behalf of Carmichael's First Unnamed Asian Client, agreed to the Right of First Refusal and represented that none of them would offer the 2015 Work for sale without first offering it to ISG to buy back.

86. Pursuant to the terms of the parties' agreement, Carmichael and the Gallery, on behalf of Carmichael's First Unnamed Asian Client, agreed to the Exhibition Right and represented that the 2015 Work would be made available for exhibition in museums during the Three-Year Resale Restriction period.

87. ISG has performed all of its obligations in connection with the sale of the 2015 Work.

88. Several months after the sale of the 2015 Work to Carmichael's First Unnamed Asian Client via the Gallery was completed, ISG learned that the 2015 Work was being offered for sale and that the buyer apparently had no knowledge of the 2015 Work Sale Conditions ISG had bargained for.

89. Carmichael and the Gallery breached the parties' agreement concerning ISG's sale of the 2015 Work by offering the 2015 Work for sale within three years of the purchase of the 2015 Work in violation of the Three-Year Resale Restriction.

90. Carmichael's First Unnamed Asian Client breached the parties' agreement concerning ISG's sale of the 2015 Work by offering the 2015 Work for sale within three years of the purchase of the 2015 Work in violation of the Three-Year Resale Restriction.

91. Carmichael and the Gallery breached the parties' agreement concerning ISG's sale of the 2015 Work by offering the 2015 Work for sale without first offering it to ISG to so that ISG could buy it back, in violation of the Right of First Refusal.

92. Carmichael's First Unnamed Asian Client breached the parties' agreement concerning ISG's sale of the 2015 Work by offering the 2015 Work for sale without first offering it to ISG to so that ISG could buy it back, in violation of the Right of First Refusal.

93. Due to Carmichael's abuse of the privilege of doing business in the corporate form the corporate veil of the Gallery must be pierced and Carmichael held personally liable for the damages resulting from Carmichael's breaches of the parties' agreement for the sale of the 2015 Work.

94. ISG has suffered damages resulting from ISG's direct losses stemming from ISG's sale of the 2015 Work at a special price, in reliance on Carmichael's misrepresentations that ISG Carmichael's First Unnamed Asian Client agreed to ISG's 2015 Work Sale Conditions

in an amount to be determined at trial, due to Carmichael and the Gallery's breach of the terms of the parties' agreement for the sale of the 2015 Work.

95. ISG has also suffered damages as a result of the loss of its rights in connection with any resale in amount to be determined at trial.

96. ISG has further suffered damages as a result of the loss of its ability to participate in the Artist's exclusive primary market, in amount to be determined at trial, due to the breach by Carmichael, the Gallery, and Carmichael's First Unnamed Asian Client's breaches of the terms of the parties' agreement for the sale of the 2015 Work.

## SECOND CLAIM FOR RELIEF
### (Breach of the Sale Agreement for the 2010 Work)

97. ISG repeats and realleges the Allegations set forth in paragraphs 1 through 96 above as though fully set forth herein.

98. ISG, Carmichael, and Carmichael's purported Second Unnamed Asian Client were parties to the November 2018 Sale Agreement for the sale of the 2010 Work.

99. At the time ISG was contracting with Carmichael, ISG was made to believe that the Gallery was a viable entity with the power to enter into the contemplated transaction.

100. At the time ISG was contracting with Carmichael, ISG was made to believe that the Gallery was a viable entity with assets or the availability of assets to pay debts as they came due.

101. Pursuant to the terms of the November 2018 Sale Agreement, Carmichael and Carmichael's purported Second Unnamed Asian Client agreed to the 2010 Work Sale Conditions, *i.e.*, the Three-Year Resale Restriction and the Right of First Refusal.

102. ISG has performed all of its obligations in connection with the sale of the 2010 Work.

103. Several weeks after the sale of the 2010 Work to Carmichael and Carmichael's purported Second Unnamed Asian Client was completed, ISG learned that the 2010 Work had been resold via a group of intermediary art dealers and that the end purchaser, based in the United States, apparently had no knowledge of the 2010 Work Sale Conditions ISG had bargained for.

104. Carmichael breached the November 2018 Sale Agreement by reselling the 2010 Work within three years of the purchase of the 2010 Work, in violation of the Three-Year Resale Restriction.

105. Carmichael's purported Second Unnamed Asian Client breached the November 2018 Sale Agreement by reselling the 2010 Work within three years of the purchase of the 2010 Work, in violation of the Three-Year Resale Restriction.

106. Carmichael breached the November 2018 Sale Agreement by reselling the 2010 Work without first offering it to ISG to so that ISG could buy it back, in violation of the Right of First Refusal.

107. Carmichael's purported Second Unnamed Asian Client breached the November 2018 Sale Agreement by reselling the 2010 Work without first offering it to ISG to so that ISG could buy it back, in violation of the Right of First Refusal.

108. Due to Carmichael's abuse of the privilege of doing business in the corporate form the corporate veil of the Gallery must be pierced and Carmichael held personally liable for the damages resulting from Carmichael's breaches of the November 2018 Sale Agreement.

109. ISG has suffered damages resulting from ISG's direct losses stemming from the breach by Carmichael and Carmichael's purported Second Unnamed Asian Client of the November 2018 Sale Agreement because ISG sold the 2010 Work at a special price in reliance

on the misrepresentations of Carmichael and Carmichael's purported Second Unnamed Asian Client that they would adhere to the 2010 Work Sale Conditions in an amount to be determined at trial, due to Carmichael and the Gallery's breaches of the November 2018 Sale Agreement.

110. ISG has also suffered damages as a result of the loss of its rights in connection with any resale in amount to be determined at trial.

111. ISG has further suffered damages as a result of the loss of its ability to participate in the Artist's exclusive primary market, in amount to be determined at trial, due to the breach by Carmichael, the Gallery, and Carmichael's Second Unnamed Asian Client's breaches of the terms of the November 2018 Sale Agreement.

### THIRD CLAIM FOR RELIEF
### (Fraud in the Factum)

112. ISG repeats and realleges the Allegations set forth in paragraphs 1 through 111 above as though fully set forth herein.

113. On information and belief, Carmichael perpetrated a fraud on ISG by misleading ISG into believing that the Gallery was a viable entity with the power to enter into the contemplated transaction.

114. On information and belief, Carmichael perpetrated a fraud on ISG by misleading ISG into believing that the Gallery was a viable entity with assets or the availability of assets to pay debts as they came due.

115. On information and belief, Carmichael perpetrated a fraud on ISG by forging the signature of the purported Second Unnamed Asian Client on the parties' November 2018 Agreement in order to mislead ISG into believing that it was contracting directly with Carmichael's purported Second Unnamed Asian Client when Carmichael knew that ISG was not so contracting.

116. On information and belief, the parties never agreed to the November 2018 Agreement because there was never a meeting of the minds as a result of Carmichael's forging of the signature of the purported Second Unnamed Asian Client.

117. On information and belief, as a result of Carmichael's forgery, the November 2018 Agreement is void *ab initio*.

118. ISG has suffered damages resulting from the fraud perpetrated by Carmichael through the forgery of the signature of Carmichael's purported Second Unnamed Asian Client on the November 2018 Sale Agreement because ISG relinquished possession of the 2010 Work in amount to be determined at trial due to Carmichael's fraud.

119. ISG has also suffered damages as a result of the loss of its ability to participate in the Artist's exclusive primary market, in an amount to be determined at trial.

120. On information and belief, given that no contract was formed as a result of Carmichael's fraud, ISG is entitled to rescind the sale and to the immediate return of the 2010 Work from Doe.

**FOURTH CLAIM FOR RELIEF**
**(Fraud in the Inducement)**

121. ISG repeats and realleges the allegations set forth in Paragraphs 1 through 120 above as though fully set forth herein.

122. On information and belief, Carmichael fraudulently induced ISG into selling the 2015 Work and the 2010 Work by misrepresenting that ISG would be contracting directly with Carmichael's Clients who had purportedly agreed to ISG's 2015 Work Sale Conditions and ISG's 2010 Work Sale Conditions.

123. Carmichael's misrepresentations were material because ISG would not have sold Carmichael and the Gallery the 2015 Work or the 2010 Work if it had known that neither

Carmichael, the Gallery, nor Carmichael's Clients would adhere to the 2015 Work Sale Conditions and the 2010 Work Sale Conditions.

124. ISG's reliance was reasonable given, among other things, Carmichael's repeated representations during the parties' discussions that Carmichael, the Gallery, and Carmichael's Clients would be bound to the 2015 Work Sale Conditions and the 2010 Work Sale Conditions.

125. In reasonable reliance on Carmichael's material misrepresentations, ISG has suffered damages—including, *inter alia*, the loss of the difference between the special price and retail value of the 2015 Work and the 2010 Work at the time of the sale, the loss of its rights in connection with any resale, and the loss resulting from losing its ability to participate in the Artist's exclusive primary market, due to Carmichael's fraudulent misrepresentations in an amount to be determined at trial and additional related expenses.

126. Because Carmichael engaged in the fraudulent conduct stated in this Complaint knowingly, willfully, maliciously, and with intent to damage ISG, as demonstrated, on information and belief, by Carmichael's forging of the signature of Carmichael's purported Second Unnamed Asian Client, ISG is also entitled to an award of punitive damages.

**WHEREFORE**, ISG demands judgment as follows:

a. On its first cause of action, awarding ISG compensatory damages in an amount to be determined at trial, but no less than Four Hundred Fifty Thousand Dollars ($450,000.00), plus interest;

b. On its second cause of action, awarding ISG compensatory damages in an amount to be determined at trial, but no less than Five Hundred Thousand Dollars ($500,000.00), plus interest;

c. On its third cause of action, ordering the immediate return of the 2010 Work from its current possessor, Doe, as well as punitive damages in an amount to be determined at trial, plus interest;

d. On its fourth cause of action, awarding ISG damages, including punitive damages, in an amount to be determined at trial, but no less than One Million Dollars ($1,000,000.00), plus interest;

e. Awarding ISG the costs and disbursements of this action, including attorneys' fees; and

f. Awarding ISG such other or further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Pursuant to FED. R. CIV. P. 38(b), the Gallery demands a trial by jury.

Dated: New York, New York
2021-July-23

**OLSOFF | CAHILL | COSSU LLP**

By: _____/s/ Paul Cossu_____
Paul Cossu
John R. Cahill
Aimée Scala
3 Water Street
Ellenville, New York 12428
212-719-4400

*Attorneys for Plaintiff*
*International Systems Group, Inc.*